OPINION
{¶ 1} Lance R. Murphy appeals from his conviction and sentence following a jury trial on charges of felony murder, felonious assault, and carrying a concealed weapon. *Page 2 
 {¶ 2} Murphy advances two assignments of error on appeal. First, he contends his felony murder and felonious assault convictions are against the mainfest weight of the evidence. Second, he asserts that he received constitutionally ineffective assistance of counsel at trial.
 {¶ 3} The present appeal stems from a fight that occurred outside a bar called "The Spot" in the early morning hours of April 4, 2004. During the incident, Murphy and his friend, Edward Johnson, fought with members of another group that included Anthony Jones and Dennis Godsey, the two victims in this case. Murphy does not dispute the sufficiency of the State's evidence to support a finding that he fatally stabbed Johnson and wounded Godsey with a pocketknife. The issue raised in Murphy's first assignment of error is whether his convictions are against the manifest weight of the evidence because he proved self-defense at trial.
 {¶ 4} When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 5} Here Murphy contends the manifest weight of the evidence supports a finding that he acted in self-defense when he stabbed Jones and Godsey. In order to *Page 3 
prove self-defense, a defendant must establish, by a preponderance of the evidence, that (1) he was not at fault in creating the situation giving rise to the assault, (2) he honestly and reasonably believed he was in immediate danger of bodily harm, (3) his only means to protect himself was to use force, and (4) he did not violate a duty to retreat or avoid the danger. State v. Bean, Montgomery App. No. 19483, 2003-Ohio-2962,1J16.
 {¶ 6} In support of his self-defense argument, Murphy cites his own statements to police after his arrest. The statements were recorded on a videotape that was played for the jury. Among other things, Murphy told police that he felt justified in using his knife because he was being beaten and did not know when his multiple attackers would stop. He also insisted that his attackers had him backed up against a wooden building where he could not retreat. On appeal, Murphy additionally points out that he sustained a knife wound of his own. Finally, he asserts that Jones left the melee and voluntarily returned.
 {¶ 7} Upon review, however, we note that the State presented evidence from which the jury reasonably could have rejected Murphy's self-defense argument. Although the fight outside the bar involved several people, the State's witnesses testified that Murphy primarily fought alone against Jones. Additionally, Godsey testified that Murphy threw the first punch at Jones. According to Godsey, Murphy also appeared to be hitting Jones in the stomach while Jones, not Murphy, was backed up against a wall. Another witness, Tia Warner, testified that she too saw Murphy appear to be punching Jones while Jones was backed up against the door of a building. Godsey also told the jury that Jones looked like he was injured. When Godsey intervened to pull Murphy away from Jones, Murphy began hitting Godsey and stabbed him in the lower *Page 4 
back. Godsey responded by shaking the knife loose from Murphy's hand. Godsey then saw that Jones was bleeding from the stomach, where Murphy had stabbed him several times.
 {¶ 8} Following the incident, Tia Warner overheard Murphy state that he "had stabbed any mother fucker that came close to him." When Murphy went to a hospital to receive treatment for a cut on his hand, he initially told Xenia police that he had been stabbed at Hotties' bar by an unidentified assailant. After being identified as a suspect in the present case, however, Murphy admitted having been involved in a fight outside The Spot. He also told police that he did not know whether he had cut his own hand during the incident.
 {¶ 9} Having reviewed the entire trial transcript, we believe the jury reasonably could have found that Murphy was at fault in his stabbing of Jones and Godsey, that he could have protected himself without using a knife, and/or that he should have avoided the danger by withdrawing when he had Jones backed up against a building. Because the evidence supports the jury's rejection of Murphy's self-defense claim, we find no merit in his argument that his felony murder and felonious assault convictions are against the manifest weight of the evidence. The first assignment of error is overruled.
 {¶ 10} In his second assignment of error, Murphy asserts that he received constitutionally ineffective assistance of counsel at trial. In particular, he contends his attorney failed to conduct an adequate cross examination of the State's DNA expert and failed to pursue an objection to the State's use of a peremptory challenge to remove the only prospective African American juror.
 {¶ 11} We review Murphy's claim under the two-part test ofStrickland v. *Page 5 Washington (1984), 466 U.S. 668. "To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." State v. Madrigal, 87 Ohio St.3d 378, 388-389,2000-Ohio-448. When evaluating an ineffective assistance of counsel claim, "judicial scrutiny of counsel's performance must be highly deferential." Strickland, supra, at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Bradley (1989),42 Ohio St.3d 136.
 {¶ 12} With the foregoing standards in mind, we find no merit in either of Murphy's arguments. The State's DNA expert, Mark Losko, testified about his analysis of blood samples found on Murphy's knife. According to Losko, some of the blood on the knife matched Murphy's own blood sample at sixteen of sixteen locations on a DNA strand, an occurrence with a probability of one in 1.6 to 2.0 sextillion. At one of the sixteen locations, Losko found an additional DNA type that was consistent with Jones' blood. Losko stated that this additional DNA type also was consistent with the blood of ten percent of the population.
 {¶ 13} Defense counsel cross examined Losko relatively briefly to establish that the blood on the knife could have gotten there in various ways. On appeal, Murphy contends his attorney provided ineffective assistance by failing to ask Losko about the type of testing performed, its error rate, the handling of the blood samples, any conflict of interest, or the fact that both samples came from African American men of similar age *Page 6 
and from the same community. Absent cross examination on these issues, Murphy claims the jury received "erroneous statistical guidance" that was prejudicial to him.
 {¶ 14} We are unpersuaded by the foregoing argument. Murphy claims defense counsel should have conducted a more vigorous cross examination to combat the DNA evidence, which left the jury with an inference that Jones' blood was found on the knife. At trial, however, defense counselconceded that Murphy had stabbed Jones. In his closing argument, defense counsel admitted that "[t]here is no dispute that Lance stabbed [Jones]." The defense's position at trial was that the stabbing had been an act of self-defense, not that it didn't occur. As a result, there would have been no purpose in defense counsel conducting more extensive cross examination to impeach the results of the DNA testing. Given the admission that Murphy had stabbed Jones, the possible presence of Jones' blood on the knife could not have surprised anyone.
 {¶ 15} We also reject Murphy's assertion that defense counsel provided ineffective assistance by failing to pursue an objection to the State's use of a peremptory challenge to remove Mr. Holder, the only prospective African American juror.
 {¶ 16} The record reflects that Holder raised his hand in response to a question from the prosecutor about whether the potential jurors "had any other kind of connection other than jury service with a criminal prosecution, witness, victim, defendant[.]" Upon further questioning, Holder said a family member had passed a bad check in connection with a drug-related matter that he characterized as being "personal." The prosecutor then asked Holder whether he could be fair and impartial in this case. Holder responded, "I'm not sure." He attributed this uncertainty to the bad-check issue *Page 7 
involving a family member and to "other things." Holder then assured the prosecutor that he could be fair but admitted still having a private concern about serving on the jury. At a subsequent sidebar discussion, Holder revealed the nature of his concern. He explained that his sister-in-law was married to a person with the last name Murphy. Holder was unsure of the relationship, if any, between the defendant and his sister-in-law. He stated: "I'm not sure I know the individual. I think there might be family members I might know, but it's up to you all. I mean, I still can be fair[.]" When asked whether the issue caused him trouble, however, Holder responded, "I'm not sure."
 {¶ 17} The prosecutor later exercised a peremptory challenge to remove Holder from the jury panel. In response to a request from defense counsel, the prosecutor provided the following reason for removing Holder:
 {¶ 18} "Your Honor, I excused Mr. Holder because of the side-bar information that came out in the side-bar earlier this morning where Mr. Holder said that he might be related to the Murphies and he doesn't know if he is or not, and there just wasn't any way for us to figure out if he was or not. But as the trial progressed, in my view, he may find out, and if that answer was that he was related, that would be a very serious problem. So I exercised this peremptory challenge to excuse him for that reason."
 {¶ 19} The trial court accepted the foregoing explanation as a race-neutral reason for excusing Holder.
 {¶ 20} On appeal, Murphy reasons that Holder could have been replaced by an alternate juror during trial if it were established that a relationship existed. He also asserts that any harm resulting from impaneling Holder was less important than "ensuring the racial and ethnic fairness of the panel itself." Finally, he insists that "a *Page 8 
simple phone call" could have determined Holder's "pedigree." According to Murphy, his trial counsel provided ineffective assistance by failing "to challenge the specious reasoning behind the prosecution's purported non-discriminatory reason for the dismissal of Mr. Holder."
 {¶ 21} We are unpersuaded by Murphy's argument. "A challenge to the State's exercise of a peremptory challenge upon the ground of racial discrimination is a three-step process. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Then, the proponent of the challenge must provide a racially neutral explanation for the challenge. But the explanation need not rise to the level justifying a challenge for cause. Finally, the trial court must find, based upon all of the circumstances, whether the opponent has proved purposeful racial discrimination." State v.Williams, Montgomery App. No. 19963, 2005-Ohio-3172, ]}15, citingBatson v. Kentucky (1966), 476 U.S. 79.
 {¶ 22} Murphy's argument here focuses on the second and third steps of the foregoing analysis. He contends the prosecutor's professed race-neutral reason for removing Holder was "specious." Thus, he suggests that his attorney provided prejudicially deficient representation by failing to prove purposeful race discrimination. We disagree. The issue when a prosecutor gives reasons for removing an African American juror is whether those reasons are facially valid.Williams, supra, at ]}18. The reasons need not be persuasive or even plausible. They will be deemed race-neutral unless a discriminatory intent is inherent in the prosecutor's explanation. Id.
 {¶ 23} In this case, the prosecutor cited Holder's concerns about the existence of a relationship with Murphy as the motivation for the peremptory challenge. Although *Page 9 
Murphy believes this reason is not a good one, it is facially valid and race-neutral. Moreover, nothing in the record supports Murphy's contention that the prosecutor's rationale for removing Holder was "specious." Holder himself raised the issue of a possible relationship with the defendant, and his own comments reveal that the situation made him uneasy about serving on the jury. As for Murphy's argument that a telephone call could have resolved the issue of Holder's "pedigree," nothing in the record establishes what information, if any, such a call would have uncovered. Therefore, Murphy cannot demonstrate ineffective assistance of counsel based on his attorney's failure to seek a collateral inquiry into Holder's family tree. Based on the record before us, we cannot say that defense counsel provided ineffective assistance by failing to impeach the credibility of the prosecutor's reason or by failing to prove discriminatory intent.
 {¶ 24} Murphy's second assignment of error is overruled, and the judgment of the Clark County Common Pleas Court is affirmed.
 FAIN and GRADY, JJ., concur. *Page 1