[Cite as *State v. Heydinger*, 2011-Ohio-5022.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                          :

    Plaintiff-Appellee                        :                C.A. CASE NO.    24153

v.                                                            :                T.C. NO.    10CRB2994

KAREN D. HEYDINGER                             :                (Criminal appeal from
                                              Municipal Court)
    Defendant-Appellant                      :

                                                :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the _____30th_____ day of _____September_____, 2011.

. . . . . . . . . .

SHAUNA HILL, Atty. Reg. No. 0074569, Assistant City Prosecutor, 335 W. Third Street, Room 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

ADAM JAMES STOUT, Atty. Reg. No. 0080334, 2533 Far Hills Avenue, Dayton, Ohio 45419
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Karen Heydinger, filed July 16, 2010. On April 12, 2010, Heydinger was charged in Dayton Municipal Court with one count of assault, in violation of R.C. 2903.13(A), a misdemeanor of the first

degree.   Following a bench trial, Heydinger was found guilty.

{¶ 2}   At trial, Tyrone Givens testified that he lives in a house on Clover Street and that Heydinger lives in an adjacent four-unit apartment building owned by George Day. According to Givens, Heydinger repeatedly allowed her dog onto Givens' property, and on April 10, 2010, Givens, who was outside working on a fence, approached Day about the situation as Day pulled up in his car.   After about three minutes, Givens testified, Heydinger came outside and questioned Givens about his conversation with Day.   According to Givens, Heydinger "became very aggressive and very belligerent.   Everything became a racial slur. * * * It was very unneighborly if I may." As Givens and Day faced each other in conversation, Givens stated that Heydinger, who was behind Day, reached over Day's shoulder and punched Givens in the eye.   Givens stated Heydinger punched him a total of three times.   In response, Givens stated that he yelled at Heydinger but did not touch her. Givens phoned the police, who arrived, took statements from Givens and other witnesses, and arrested Heydinger.   Givens identified two photographs of himself that were taken the day after the incident which depict a large scratch under his left eye, and the inside of his bottom lip.

{¶ 3}   On cross-examination, Givens stated that he informed Day that he was building a fence due to the problem with Heydinger's dog.   He stated that Day told Heydinger to "cease her racial comments" and go back inside, but Heydinger continued the name calling.   After the assault, Givens testified that Heydinger remained outside while he called the police, and that Heydinger also called the police.

{¶ 4}   David Firth testified that he is a self-employed contractor, and he was

installing a privacy fence at Givens' home on April 10, 2010. According to Firth, he observed Givens talking to Day, and he stated that the men were a foot or two apart and did not appear to be arguing. Firth did not hear what they were saying. After a couple of minutes, Firth stated that he observed Heydinger "come out of the apartment hollering and screaming and stuff and then she threw out some racial slurs." Firth stated that he observed Heydinger hit Givens in the facial area one time. Firth testified that he was 20-30 feet away at the time, and that his view was unobstructed. Firth stated that Givens did not hit Heydinger. On cross-examination, Firth stated that when Heydinger came outside, he heard her say something like, "if you've got something to say, say it to me directly." Firth stated that Givens was not physically aggressive with Day or Heydinger, but that he yelled at Heydinger after she uttered the racial slurs.

{¶ 5} Jerrie Bailey testified that she is Firth's fiancee, and she was also working on Givens' fence with Firth on the date of the incident. According to Bailey, she observed Givens talking to Day about the privacy fence, and Heydinger "came out and started hollering and screaming and cussing at Mr. Givens. She made a racial slur and punched him in the eye." Bailey stated that Heydinger hit Givens one time. Bailey testified that she was 25-30 feet away from the parties, and her view was unobstructed. She stated that Givens did not respond aggressively to Heydinger.

{¶ 6} Officer Lyn Dunkin of the Dayton Police Department testified that he responded to Givens' residence, and he stated that when he arrived Givens had "a little bit of a swollen lower lip and a cut under * * * his left eye." Dunkin stated that after speaking with Givens, Firth and Bailey, he arrested Heydinger, who had no visible injuries.

**{¶ 7}** Heydinger testified that she has two dogs, and on the date of the incident, she let her dogs outside and sat on a bench in front of her apartment with her books. She stated that she observed Givens talking to Day, and she "hollered over there are you talking about my dogs again? This has been an ongoing - - he's called the dog pound on me three times and he's called the police on me." According to Heydinger, Givens responded affirmatively and then walked over to the bench where she was sitting and leaned over her, and they argued about the dogs. She stated that Givens' conduct was intimidating. According to Heydinger, she told Givens that she "had enough of him," and she told him to leave. Heydinger stated that Givens refused to leave, and she called 911. Heydinger testified that Day told Givens to go home, and when Givens turned to go, Heydinger "called him the 'N' word." Heydinger stated that Givens "said oh no you didn't and he charged me. When he charged me [Day] stepped in between us. He was screaming and he was trying to reach around [Day] to strike me and I swung with my left hand." According to Heydinger, she hit Givens with an open hand, and then "at that point he threw [Day] out aside and he picked me up and he threw me like a sack of potatoes." She stated that Day got up and "ran back in between us. [Givens] threw [Day] out of the way and picked me up and threw me again." Heydinger testified that in the course of the fight, Givens kicked her chihuahua in the head, and then he picked up a piece of concrete and ran toward Heydinger holding it over his head. She testified that Givens stopped, "and he smashed [Day's] coffee cup that was on [her] patio." Heydinger stated that when Givens turned to leave, she threw his "stuff" back into his yard. She stated that she called the police a second time.

**{¶ 8}** According to Heydinger, two officers came to her home and told her she was

under arrest. She testified that she tried to tell the officers what had happened and that she had injuries. She stated, "I had scrapes on my back. I even tried to pull up my pant legs and show him the scrapes on my legs and stuff and he said I don't care. If you don't come with us we are going to add resisting arrest to your charge."

{¶ 9} Finally, Day testified. He stated that he lives in one of the units of the apartment building that he owns, and that Heydinger is one of his tenants. Day stated that on the date of the incident, Givens came to Day's apartment and stated that he wanted to talk to him. Day testified that he and Givens walked over to Givens' yard, and Givens complained about Heydinger's dogs. Day stated that Givens asked him to tell Heydinger to keep the dogs out of his yard. Heydinger came outside, according to Day, and sat on a bench and asked Givens if the men were talking about her. Day testified that Givens walked over to Heydinger and "got up in her face." Day stated that he went over to get in between them while they argued, and he told Givens to go home and Heydinger to go inside. According to Day, Givens began to walk away when Heydinger called Givens a name. Day stated that Givens came back "very aggressively" with his hands raised and tried to hit Heydinger as she sat on the bench. Day tried to get between them, according to his testimony, and Givens shoved Day to the ground. Day testified that he "got up two or three times and got shoved to the ground." Day stated that he was "scratched up a little bit."

{¶ 10} From the ground Day observed Heydinger "go backwards," and he stated that he did not "know if she tripped or she was shoved or what." Day stated that when Givens initially approached Heydinger, he observed Heydinger strike Givens. Finally, Day stated that when he was on the ground, Givens "came over with a piece of concrete. He run back

towards his house and he came back with a piece of concrete." Givens then stopped and returned home, according to Day.

{¶ 11} On cross-examination, Day stated that he was standing in between Givens and Heydinger when Heydinger hit Givens. According to Day, Heydinger reached around his shoulder to strike Givens. Day stated that the police came to his apartment to obtain a phone number for Heydinger before transporting her to jail, and he stated that he did not speak to them about the incident. Day described Heydinger as a "good friend." He described Givens as "a neighbor," and he stated that he had not had any trouble with him prior to the incident.

{¶ 12} On redirect, Day stated that Givens was "very aggressive - chest puffed out," when Heydinger struck him.

{¶ 13} Heydinger asserts two assignment of error. Her first assignment of error is as follows:

{¶ 14} "APPELLANT'S CONVICTION OF THE CHARGE OF ASSAULT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 15} According to Heydinger, she acted in self-defense, and the testimony of Givens is not credible.

{¶ 16} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

(Internal citations omitted). Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Dossett*, Montgomery App. No. 20997, 2006-Ohio-3367, ¶ 32.

{¶ 17} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass* (1997), 10 Ohio St.2d 230, 231. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288.

{¶ 18} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97-CA-03.

{¶ 19} R.C. 2903.13(A) provides, "No person shall knowingly cause or attempt to cause physical harm to another * * * ." "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 20} "Self defense is an affirmative defense, which the defendant has the burden to prove by a preponderance of the evidence. R.C. 2901.05(A); *State v. Jackson* (1986), 22 Ohio St.3d 281, 283 * * *." *State v. Tribble*, Montgomery App. No. 24231,

2011-Ohio-3618, ¶ 35. "In order to prove self-defense, a defendant must establish, by a preponderance of the evidence, that (1) he was not at fault in creating the situation giving rise to the assault, (2) he honestly and reasonably believed he was in immediate danger of bodily harm, (3) his only means to protect himself was to use force, and (4) he did not violate a duty to retreat or avoid the danger. *State v. Bean*, Montgomery App. No. 19483, 2003-Ohio-2962." *State v. Murphy*, Clark App. No. 05-CA-71, 2007-Ohio-1747, ¶ 5.

**{¶ 21}** Having thoroughly reviewed the entire record, weighed all of the evidence and the reasonable inferences, and considered the credibility of the witnesses, we cannot conclude that the trial court clearly lost its way and created a manifest miscarriage of justice such that a new trial is warranted. When Officer Dunkin arrived on the scene, he observed a cut under Givens' left eye and that his lip was swollen, injuries consistent with Givens' version of events that Heydinger struck him more than once. Dunkin did not observe any injuries on Heydinger. Givens, Firth and Bailey all testified that Givens was not physically aggressive toward Heydinger. The trial court, who observed all the witnesses, clearly credited Givens, Firth's and Bailey's testimony over that of Heydinger's and Day's, and we defer to the court's determination of credibility. The fact that Day did not tell the officer who came to his apartment to obtain his phone number that he and his "good friend," Heydinger, were the victims and that Givens was the primary aggressor casts some doubt on his version of events. Day's testimony that Heydinger reached around his shoulder to strike Givens is consistent with Givens' testimony about the manner in which he sustained injury. Since the trial court could reasonably determine that Heydinger was the primary aggressor, and since the evidence reasonably suggests that Givens was not physically aggressive toward

her, Heydinger did not establish that she was not at fault in creating the situation, and we cannot conclude that she acted in self-defense. There being no merit to Heydinger's first assigned error, it is overruled.

{¶ 22} Heydinger's second assigned error is as follows:

{¶ 23} "APPELLANT WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL."

{¶ 24} According to Heydinger, defense counsel was ineffective in failing to demand a trial by jury. She asserts, "a jury trial would increase Ms. Heydinger's probability of a different outcome given the increased number of individuals serving as trier of fact."

{¶ 25} "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * * . Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, Montgomery App. No. 21957, 2008-Ohio-493, ¶ 31.

**{¶ 26}** Heydinger directs our attention to *State v. Blair* (2007), 171 Ohio App.3d 702, ¶ 16 ("Given the fact that defense counsel admittedly did not prepare, and then sat silently by as Blair was convicted without any defense whatsoever, it can be presumed that appellant was prejudiced by defense counsel's inaction, thereby warranting a finding of ineffective assistance of counsel.") We agree with the State that ineffective assistance herein is not demonstrated, and that Heydinger cannot establish that the outcome of her trial would have been otherwise had her case been tried to a jury. In fact, Heydinger herself merely asserts that a trial by jury would have *increased the probability* of a different outcome. As noted above, a debatable decision regarding trial strategy, including a bench trial in lieu of a jury trial, cannot establish ineffective assistance of counsel. We finally note that, in contrast to *Blair*, defense counsel cross-examined the State's witnesses and thoroughly presented Heydinger's version of events to the trial court, including adducing evidence of the affirmative defense of self-defense. There being no merit to Heydinger's second assigned error, it is overruled.

**{¶ 27}** The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Shauna Hill
Adam James Stout
Hon. Christopher D. Roberts